.Reese, J.
delivered the opinion of the court.
The prisoner was indicted for murder in the first degree, in the circuit court of Sumner county, was found guilty, and sentence of death pronounced against him. He has appealed in error to this court. The errors assigned in argument and insisted on here are:
1st. That in the progress of empanneling the jurors for his trial, he challenged, for cause, certain persons summoned for the purpose of being jurors, that his challenges were disallowed, and he had to challenge them peremptorily.
2d. That the state was permitted to prove the mild and pacific temper and habits of the deceased, for whose murder he stood indicted.
3d. That a witness who had arrested the prisoner in Arkansas, and who had been examined in chief and had been discharged, brought into court in the progress of the trial, a pistol, knife, See., which, in the presencé of the jury, he handed to the-court, saying that they were the property of the prisoner, taken from his person when arrested.
4th. That certain conversations of the deceased, the night before he left home, touching the object of his next day’s trip, were permitted to be proved as a fact, explaining the motives and purposes of his journey, or as connected with and parcel of the transaction.
Upon the first question, the bill of exceptions informs us that on the trial of the qualifications and competency of those furnished as jurors before the court, four of those called said that upon report, they had formed and expressed an opinion as to the guilt or innocence of the prisoner, and, that so far as they knew, they had heard none of the witnesses speak of the case. The report they had heard related to Isaac Lindsey’s death, and contained the circumstances of his death, but whether .all. the circumstances of his death or not, they did not know, and a fifth said he had heard the same circumstances of the case, to wit, the finding of the body of the man that was killed, in the river, and that the prisoner was in some way connected with that circumstance. That he had not heard any body speak *317 of it who knew the circumstances of the case, so far as he knew; that he had heard it from report only. These persons were put to the prisoner by the court, and he peremptorily challenged them.
It has been contended here, that they were incompetent by operation of the rule laid down by this court, in the case of McGowan against the State, 9 Yerg., and reviewed and affirmed at this term in the case of Payne vs. State. The court in the case of McGowan vs. State, sought to distinguish between impressions or opinions ' founded upon rumor merely, however circumstantial in its narrative and detail, and those opinions of greater dignity and weight founded upon information derived from persons who .professed to know, and who detailed the circumstances of the case, and whose statements were relied on and believed* although not eye-witnesses of the transactions, or witnesses in the case. We are certain the fifth person above spoken of does not come within this rule, and wre believe none of them do; but this is the less material because the prisoner on the trial did not exhaust his peremptory challenges — he challenged but thirty-one jurors; and in the same case of McGowan against the State, it was ruled that under such circumstances the act of the court in putting an incompetent juror to the prisoner would not constitute'a ground for reversal.
2d. It is insisted that the court erred in permitting testimony to be given, that the deceased was of mild and pacific temper and habits. There is nothing in this objection.
The case depended upon circumstantial proof, and it was proper to suffer this fact to be proved as a circumstance tending to aid the jury in ascertaining the-probable grade of the of-fence. It would also haVe been competent for the prisoner to have made proof, if he could, of a contrary character, independently of the fact that the State made the proof in question.
As to the third objection, .taken to the proceeding in the trial, that a witness examined in chief and discharged, afterwards brought the articles mentioned into court and stated them to be the property of the prisoner, taken from his person in the State of Arkansas — this was of no importance in the case, unless it could *318 have been deemed so, to show that the prisoner had arms about him when arrested. It seems to have been intended as a mere surrender to the court of the prisoner’s property, and if it were otherwise, witness stated that the fact had escaped his recollection. The State had not concluded its. testimony, and in any view which can be taken of it, it belongs to that class of transactions having reference to the conduct and order of business in court, necessarily confided to the judgment and discretion of the judge, and of difficult control and supervision by this court.
4. The fourth objection relates to the testimony given by a witness of the name of Warren, as to the conversations of the deceased the night before he left home, touching the motives and objects of his next day’s trip. To show the status of the case, and the connection of testimony with the general transaction, we will set forth some of the testimony which preceded it and some which followed it. W. R. Sanders proved that from two to six weeks before the 14th December, the day of the death, he passed by the house of the deceased and saw prisoner there. He returned the same evening and staid all night, prisoner was still there and staid all night; deceased, when lighting witness to bed, had some conversation with him as to prisoner and his business. In the morning the deceased and prisoner were in the passage between the ends of the house; deceased called witness to them, arid in allusion, to the last night’s conversation said: “I was mistaken as to the place where the silver ore which Mr. Carroll proposes to sell is ‘concealed; it is in the river bottom neax Nashville, and not in the bottom in this neighborhood.” Prisoner said, “Parson, if yVi let me, I’ll be off;” deceased replied “well, well,” and added that he had told witness of the ore and the proposed trade because he had known him from childhood, and wished to make him a partner in the purchase, as he himself could not raise the means to pay for it. The defendant said he would take $300 or $400 for the ore, and would be satisfied with $100 or $150 in hand, forwhich sum he had immediate use, but could wait for the balance till next fall, when he expected to leave. Deceased said he had $100 which he could pay down, and if witness would join him he could raise the rest. When witness left, prisoner went with *319 him to bis ferry, and as they went, he asked defendant many questions about the ore, and learned from him that he had found it on public land in Missouri, near to, or adjoining a tract of his own, and he had disclosed the place where it had been found but to One friend, who would. secure the place for him; that he had ninety-three pounds of it in the river bottom near Nashville, that he had sold one pound of the ore for $14. Isaac Warner proved that he was the brother-in-law of deceased, and lived and cropped with him in the year 1840; prisoner frequently came there during that year, and was familiar with deceased; that on Wednesday or Thursday before the 14th December, prisoner was at deceased’s house and staid all night, on which occasion he heard him and deceased talk together about the silver ore which the prisoner said was concealed in the river bottom below Mrs. Sims’, and they talked about the proposed sale of it to the deceased. ■ The prisoner told deceased he wished him to come over in a few days and go to Nashville, and put a finish to the business, which deceased promised he would do.
Alexander Jackson proved that his wife is the- daughter of Mrs. Sims, and the niece of the prisoner, that the prisoner staid all night at Mrs. Sims’ on the night of the 13th, that on the morning of the 14th, before breakfast, deceased came there; at breakfast he and the prisoner made preparation to leave together, deceased saying that he and “Green,” meaning the prisoner, were going on a “speculating spree” and might be at Nashville before they returned, that they started together, deceased riding and prisoner walking on foot, and carrying his gun. We now cometo the point in question. Warner, the second witness called, having testified as above stated, was asked by the prosecuting counsel to state in the first place what deceased said-on the morning of the 14th December, 1840, relating-to the trip or absence from home about to ensue, and witness stated that deceased made his preparations very early to leave home, but would not communicate to him and his wife very distinctly his object, but borrowed witness’s saddle rigging, and said, on witness asking him, that he should be back on Tuesday, and if not till Wednesday, he hoped he would i!break no squares with him,” alludingto his partnership cropping, *320 and his absence at the time of gathering thé crop; that after very early breakfast, half an hour or so by sun, he left, saying that he was “going to make a finish of the trade one way or the other;” that witness saw him no more till his body was found.
The counsel for the State then offered to prove by witness the conversation of the deceased the evening before on the subject of his proposed trip and absence; the prisoner objected to the legal competency of the testimony, and the court overruled the objection and permitted witness to state any conversation on the subject of the trip, and the object of the trip which took place on that evening, and the witness proceeded and stated that deceased said the prisoner had told him he had discovered a silver ore mine in the State of Missouri, on Congress land, that he had brought a quantity of it and deposited it in the river bottom between that and Nashville, and that defendant had proposed to trade it to him, and that he was going to make the trade, and the next day he was going to see the defendant and examine the ore; the witness replied that he did not believe the prisoner had any ore, and stated his reasons at length for the belief, in reply to which the deceased remarked that “he believed the prisoner to be as clever a man as any that spoke hard of him.” The question now' is, was this testimony competent; and we think it yvas competent. On two distinct grounds we think this maintainable,
1st. Because the testimony shows that a few evenings before, the prisoner told the deceased that he must come over and close the trade, and when they were at Sims’s, deceased said in the act of starting, and in the presence of prisoner, that they were going on a “speculating spree” and might go as far as Nashville; the same morning, at home, he told Warner, in. allusion to the conversation of the preceding evening, that he was going to “finish the trade” one way or another.
It was competent to show by the conversation of the preceding evening what was meant by the terms ‘ ‘speculating spree’ ’ and “finish the trade,” and what was the object of his trip, and that he really believed and confided in, and was about to act upon, the long depending and mysterious story of the silver ore.
2d. But- independently of the ground above set forth, that *321 the testimony in question was properly heard as explanatory of the meaning of testimony, the competency of which is unquestioned, we are of opinion that the conversation of the evening of the 13th December, 1840, was properly admitted as a fact in the cause and a part of the transaction.' It is well proved that there was a negotiation depending between the prisoner and the deceased, relating to the pretended-silver ore, and thatpris-oner expected the deceased shortly to go and consummate it. And on the evening before he started on this fatal trip, he spoke to one of his family of his purpose to go on- the next morning to put an end to the negotiation,- and of his confident belief in the existence of the silver ore. Why should not this be proved as a fact? In the investigation of human affairs, whether connected with contract or crime, we are constrained to infer the motive from the act, and acts in progress are often not separable from reasons and motives avowed. Without this, in vain would we seek to elicit the very truth of the matter. The deceased left home, and in the act of leaving vaguely avowed his purpose and object, and the propriety of proving this is pot called in question; but he was vague and indefinite because he had fully explained his object the evening before. Shall what he said in the morning be a fact in the cause, and his fuller explanations of the evening before be regarded as not a fact in the cause? - Or if he had said nothing in the morning, shall the object and purpose of his' trip, although avowed on the eve of his departure, remain unexplained because not deemed a concomitant fact? The rules and principles of evidence -are founded in a peculiar degree, upon practical good sense, and spring out of an enlightened view of the nature of man and the character of the social organization, and we think they will not be found to conflict with the opinion here expressed. On the trial of Lord George Gordon for treason, the cry of the mob who accompanied the prisoner on his enterprize, was received in evidence as forming part of the res gestee, and showing the character of the principal fact. In such a case as that, the reason and nature of the thing, obviously required, that the cry of the mob, to be given in evidence, must have been strictly and literally cotempora-neous with the principal fact. Professor Greenleaf in a work *322 of admirable accuracy and precision cites that case, and adds: “so, also, when a person enters into land in order to take advantage of a forfeiture, to foreclose a mortgage, to defeat a disseisin or the like, or changes his actual residence, or is upon a journey, or leaves his home or returns thither, or remains abroad,- or secretes himself, or, in fine, does any other act, material to be understood, his declaration made at the time of the transaction and expressive of its character, motive or object, are regarded as verbal acts indicating a present purpose and intention, and are, therefore, admitted in proof like any other material facts.”
If a man say to his family, I shall leave home to-morrow morning, and state his purpose, shall we count upon the clock, and say the act of leaving home and the declaration of the purpose are not concomitant, and therefore separate the act and declaration of purpose, prove the one and exclude the other? I do not so understand the author, and I am sure such is not the sense and reason of the thing. The author, in the same section and speaking on the same subject, remarks that “the affairs of men consist of a complication of circumstances, so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and in its turn becomes the prolific parent of others, and each during its existence has its inseparable attributes and its kindred facts, materially affecting its charapter and' essential to be known in order to a right understanding of its nature;” and he adds, “these surrounding circumstances, termed the res gesto, may always be shown to the jury along with the principal fact, and their admissibility is determined by the judge accoiding to the degree of their relation to that fact, and in the exercise of his sound discretion, it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.” — See Greenleaf’s Law of Evidence, sec. 168. Upon this point of the case we have been referred by prisoner’s counsel, to the case of Kirby vs. the State, 9 Yerg. 385, as controlling this case. In that case a witness testified “that he saw Elrod, the deceased, the day before he was said to have been killed, and while on his way to the Pine mountain; that he asked Elrod to go with him; he said he could not, that he had promised *323 to go to Kirby’s house that night; that he was to go with defendant next day, and defendant was to show him a salt-petre cave.” The court held this testimony inadmissible, hot because the declaration of deceased, that he was going to the Pine mountain the next day to hunt a salt-petre cave, was not a declaration which could have been proved as part of the transaction, for the court expressly say the contrary; but because of the statement that Kirby was to accompany him and show him the salt-petre cave, with respect to whom and deceased as touching the salt-petre cave, there was no other proof. This case then, so far from weakening, in fact strengthens the ground upon which we have placed this question.
We have not thought it necessary to discuss the general evidence in the case, for it is not contended that it does fully support the verdict. So neither have we gone into the charge of the court, for in reference to the facts proved, we are of opinion that it is correct. Upon the whole matter, therefore, we must affirm the judgment in the case.